No.——

First Circuit

———

PERKINS v. LONG BELL LUMBER COMPANY, INC.

———

(February 15, 1928. Opinion and Decree.)
(April 11, 1928. Rehearing Refused.)

———

(*Syllabus by the Editor*)

1. **Louisiana Digest—Master and Servant —Par. 160 (j).**

Where the defendant fails to call witnesses who, according to the testimony given, could have contradicted the evidence given by plaintiff, there is a strong probability that witnesses were not called because defendant knew that plaintiff's version of the matter was correct. Plaintiff's version is considered correct.

2. **Louisiana Digest—Master and Servant— Par. 158.**

Where a second breaking of injured employee's leg occurs while he is still under the care of a nurse and forbidden to leave the room by the physician employed by his employer, while he was attempting to get out of bed, the second breaking of his leg is an accident arising out of and in the course of his employment within the meaning of Section 38 of Act 20 of 1914 as amended by Act 38 of 1918.

3. **Louisiana Digest—Master and Servant— Par. 154, 160(a), 160(j).**

An injured employee is justified in refusing to submit to a third operation on his leg where the preponderance of evidence shows that the operation may not help and will be attended by very great danger to employee's life. In this case employee's right to recover compensation under Act 20 of 1914 as amended, the Workmen's Compensation Act, will not be impaired.

4. **Louisiana Digest—Master and Servant— Par. 159, 159(a).**

Where injured employee's leg, after two years has not recovered sufficiently for him to perform labor, he is permanently totally disabled and is entitled to recover compensation under the Workmen's Compensation Act, Section 8, Par. D, of Act 20 of 1914, as amended by Act 43 of 1922.
(Editor's Note: The recent amendment to Act 20 of 1914 is Act 85 of 1926.)

Appeal from the Parish of Beauregard. Hon. Jerry Cline, Judge.

Action by Leroy Perkins (Gonzalous Perkins substituted as plaintiff) against Long Bell Lumber Company, Inc.

There was judgment for defendant and plaintiff appealed.

Judgment reversed.

Ped C. Kay, of De Ridder, attorney for plaintiff, appellant.

Thornton, Gist and Richey, of Alexandria, attorney for defendant, appellee.

ELLIOTT, J. Gonzalous Perkins, employed by the Long Bell Lumber Company, Inc., as rider for a skidder horse, got his right leg and thigh badly broken while engaged in the work for which he was employed to do by a falling tree which was being felled by defendant's cutters. The accident happened on May 23, 1924. He was a minor at the time, and this suit was brought for him by his father and mother. He was soon afterwards emanci-

pated and relieved of the time prescribed by law for attaining the age of majority. He was substituted as plaintiff, and proceeded with the suit in his own name and for his own benefit.

His petition alleges that the broken bones of his leg have not properly united, but overlap. That his right leg as a result is one and one-half inches shorter than the other. That the dead bones in his leg are still working out, causing soreness and a discharge. That his leg was also made crooked and his knee stiff by the break. That his injuries have produced in him a permanent total disability, and that he is unable to do work of any reasonable character. That he was being paid at the time of his injury a weekly wage of $14.40. He claims 65 per cent of his weekly wages for 400 weeks as compensation, less $656.65 admitted to have been received.

Defendant in effect concedes that it was liable to plaintiff on account of the first breaking, but claims that it has paid him all that it owes on said account. That after about five weeks of treatment and after his leg and thigh had practically healed, he fell and rebroke his leg. That this second break did not arise out of nor in the course of plaintiff's employment, but was the result of his own negligence and carelessness and due to the violation of the instructions of his physician. That defendant is not responsible for the second breaking. That the chief and only injury from which plaintiff now suffers is due to a sinus from a neucrose bone in his leg, the removal of which would be a safe and simple operation. That defendant offered to have it removed so that the discharge could heal, but plaintiff arbitrarily and unreasonably refused said treatment. That if he had permitted it to be done, his leg would have been practically healed.

Judgment was rendered in favor of the defendant and the plaintiff has appealed.

The evidence shows that some six or eight weeks after plaintiff's leg and thigh were broken, he fell and rebroke his leg, and this second break is the chief cause of his present disability.

The Judge a quo in stating his reasons for judgment held that plaintiff fell at the steps while attempting to walk down to the yard without the assistance of an attendant or other person; and further, that it was "undenied and clearly established that the second injury was incurred by reason of direct disobedience of reasonable orders of the physician."

That the employer cannot be held for an injury resulting solely from a disregard of rules of safety prescribed for his conduct. That plaintiff's act constituted almost a deliberate failure to use adequate care or protection against accident, provided for him in Section 28, Paragraph 1, of the Compensation Act.

The physician who had charge of plaintiff when he was first injured testified that he was in bed at the hospital somewhere from six to eight weeks as the result of the breaking of his leg and his thigh; that plaintiff was ready to leave the sanitarium, and was up in the house

on crutches. That he was through; that he had discharged plaintiff, and had notified defendant to get him most any day. That they had to get him at their convenience, etc. He further said:

"We instructed him not to get out of the house without the assistance of the nurse. They called me that night and the nurse told me about him hurting his leg over. After he fell they put him back to bed. Upon examination I found that the leg was broken over in the fall. Before the second break I had notified the company that I was through and he was well."

Further:

"Plaintiff told me he started down the back steps; that he did not call anybody to help him; that he had his crutches and slipped from the top step. The crutch slipped and he fell and hurt his leg."

That he had instructed plaintiff not to go out of the house without the assistance of the nurse to help him. That plaintiff told him that he did not notify anybody.

"Q. He told you about getting back to bed from the steps?
"A. The nurse carried him, and other assistants around there."

Asked if the plaintiff told him that he was sitting on the edge of the bed and tried to get up from the bed and the bed slipped from under him, he replied "no." He further testified that plaintiff was not obeying his instructions when he started down the steps without assistance: that he had given him orders not to leave the room without assistance.

"Q. You were afraid of that same proposition?
"A. Was dangerous for anybody to get on crutches like that."

Another physician who had assisted in treating plaintiff's injuries testified that he had agreed in consultation with Dr. Roberts with reference to the first break, that plaintiff was in condition to leave; that he was convalescent. That plaintiff told him he rebroke his leg trying to get out of the door.

Plaintiff's version as to how he received his second injury is as follows:

"They had me in bed for five weeks; that I did not move and Dr. Roberts told me to stir around and gain my strength back, and I was getting out of bed. The bed had rollers; me being weak I leaned back against it, and it rolled from under me."
"Q. Who helped you up? What happened?
"A. Broke my leg over again."

In response to further questions he said that they operated on him again, put him under another anaesthetic, and that he remained in the sanitarium seven weeks longer. Asked on cross-examination if it was necessary to pick him up when he rebroke his leg the second time, his answer was that he was beside the bed and pulled back up and got back in the bed. That he did not slip downstairs; that he was in the room. That he was not going down the stairs when he broke his leg the second time; that there were no stairs to go down; he was already down the stairs. That he was too weak to stand up and could not get to the steps.

There is no substantive proof to the contrary.

The lower court rejected plaintiff's demand on account of the statements which the physicians said he had made to them about starting down the back steps and falling and rebreaking his leg. The lower court, in our opinion, gave too much weight to what the physicians said on the subject. It does not appear how plaintiff came to make the statement he is said

to have made. The physicians were not questioned as to whether the statement repeated was all that plaintiff had said to them concerning the matter, nor was it brought out when the statements were made.

Plaintiff had been put under anaesthetic for the purpose of resetting his leg, but the physicians were even not questioned as to the plaintiff's mental and physical condition at the time these statements were made by him. His suffering immediately preceding and following the setting of the second break must have been intense. If his mental and physical condition had been inquired into at the time, it is not unlikely that his statements at the time would have been given little weight, if any, on that account. See Morris vs. I. C. R. R., 127 La. 446, 53 So. 698.

Not only the above, but the statements are discredited by an established fact. One of the physicians after quoting what plaintiff is claimed to have said, added the following: "After he fell they put him back to bed." And in another place he added: "The nurse carried him and other assistants around there." Now just how far the bed was from the steps does not appear, but if plaintiff had started down the back steps on his crutches and slipped from the top step and fell, as is claimed that he did, it is reasonably sure that he could not have gotten back up the steps and from there to his bed, without help. The injury was too great. It would have been necessary to carry him back. The physician says that the nurse and other assistants carried him back; consequently, if he really did fall at the door while trying to get down the back steps into the yard, as held by the lower court, his testimony as a witness on the stand explaining how it happened, would not have passed unchallenged. The nurse and others who carried him back from the door to his bed would have been called to contradict him. Therefore, plaintiff's testimony as a witness, stating how he received the second injury, is supported by the fact that the nurse and her assistants were not called, and by the strong probability that it was not done because the defendant knew that plaintiff's version of the matter as stated by him, as a witness on the stand, was true and correct. Rubenstein vs. Files, 146 La. 728, 84 So. 33; Toca vs. Rojas, 152 La. 318, 93 So. 189; Succession of Rageur, 158 La. 96.

We are convinced that plaintiff's account, given as a witness on the stand as to how his leg came to be broken, is correct. That the plaintiff acting on the instructions of the physician employed by defendant, was getting out of bed for the purpose of stirring around in an effort to gain back his strength; that the bed had rollers, and plaintiff being weak leaned back against it, upon which it rolled from under him with the result that he dropped to the floor and his leg was again broken as a result of the fall. Under such facts and circumstances, the second breaking was just as much of an accident as was the first, and must be regarded as the result of the first break, and, like it, an accident arising out of and in the course of plaintiff's employment within the contemplation of the law. Act 20 of 1914, Section 38 (Amd. 38 of 1918).

In regard to plaintiff's condition at the time he received his second injury, the physician treating him testified that he had so far recovered that he had discharged him and had notified the defendant; but the same physician also testified, and the fact was, that plaintiff was at the time in the same hospital in which he had been placed by the defendant for treatment at the time he was first injured, and

he was in there on account of his first injury at the time of the second breaking, and still under the care of the nurse, and so far from being recovered that the physician in the employ of defendant and treating him on account of the first break, had forbid his leaving the room without the assistance of a nurse.

In such a situation the plaintiff was still in defendant's service within the purview of the law, and entitled to compensation according to the condition which his first and second injury had together produced in him.

Plaintiff has undergone two operations under a general anaesthetic, and a third without an anaesthetic. Defendant wishes him to undergo another for the purpose of removing dead bone from his leg, in the hope that the discharge from the two calluses may be stopped. Plaintiff refuses, and defendant urges that his refusal is arbitrary and unreasonable.

"They asked me," plaintiff says, "to submit to another operation for the purpose of taking the bones out of my leg." He knew by that, he says, that they intended to put him to sleep and he did not believe he could stand it. A party who had been put to sleep twice, was put to sleep again and he died. He did not want to be put to sleep the third time. The above is the meaning of plaintiff's language on the subject. His fears were not unreasonable. The law does not provide for operations that may result in cures or benefits in order to reduce or cut off compensation; but at the same time there are some to which an injured employee must in reason and justice submit.

There are two discharging calluses on plaintiff's right leg coming from the seat of the fracture. The physician who had charge of his case at the time of his first and second injury, when first asked about the sinus, said that it was not due to dead bone, but upon being shown an x-ray picture of the fracture, he said that it was, and that there was a small piece of detached dead bone in a cavity at the place. He also says that if the loose piece of bone was removed the sinus would heal, and that it would work out itself in time. That it could be done by local anaesthesia and would be a minor operation and without danger to life or limb, but other physicians called by defendant, did not take such a favorable view of the matter. One of them, who had treated plaintiff, says that plaintiff was only discharged from the hospital subject to his submitting to another operation for the purpose of removing these bones. He thought that plaintiff's condition would be improved by the removal of the piece of dead bone from the cavity, and scraping the bones. In speaking of the bone that should be scraped, he, of course, did not mean the piece that was to be removed, but the remaining bone at the place of fracture. He thought that removing the piece in the cavity and the scraping of the bone would not be dangerous unless infection ensued or existed, but says that plaintiff's leg bone is diseased to some extent at the place of fracture. He therefore says in effect that the operation would be dangerous.

Another physician who had also treated plaintiff after two others had ceased to do so, and had removed five or six small pieces of bone from his leg, was not sanguine that the discharge would be cured by another operation. As for infection he said that it could not be guaranteed against but believed that an operation would result in a cure and that it could be safely performed. Still another who had examined plaintiff in behalf of defendant expressed

the opinion that the operation could be safely performed, but he was not absolutely sure that the discharge would thereby be cured. The probabilities were that it would.

A physician called by the plaintiff, and who had examined him just before the trial, expressed opinions seemingly untouched by interest in the result. He thought that the discharge would not be stopped by the removal of the piece of detached bone in the cavity. The discharge, he said, would continue as long as there is dead or infected bone, and would probably stop if all the dead and infected bone were removed. We understand him to mean that the small piece of dead bone in the cavity is not all that exists. That there is more at the seat of the fracture and that an operation for the purpose of removing it, will be dangerous, because of the infection. Danger to life from an operation which the employer wishes to have performed on an employee, has been considered by the Supreme Court and the Courts of Appeal in this State on several occasions. Bronson vs. Harris Ice Cream Co., 150 La. 455, 90 So. 759, and Martin vs. Wyatt Lumber Co., 4 La. App. 157, may be regarded as leading cases on the subject. According to the preponderance of the evidence, the operation which the plaintiff wishes the defendant to undergo, may not stop the discharge of the calluses if performed, and will be attended by a very grave danger to plaintiff's life. Plaintiff therefore will not be required to undergo it.

In regard to plaintiff's physical condition and capacity for labor there is a difference of opinion among the witnesses on that subject.

One of the physicians called by the defendant says that a good union of the fracture was obtained after the second break. He estimated plaintiff's capacity at 75 per cent of what he could formerly do.

Another thought that the union of the second fracture was all right. Another estimated plaintiff's capacity for labor at 80 per cent of formerly. Another thought that a good union was obtained after the second break, but says that some angulation exists at the side of the fracture, with overlapping fragments. That if no operation is performed the discharging calluses may continue for years. He estimated plaintiff's capacity for work at 50 per cent of what it was formerly.

The physician called by the plaintiff testified that the union at the break was not good. That fragments of the bone overlapped with ends deviating from the normal axis internally and externally. That the bone was crooked with the result that plaintiff's right leg was one and one-half inches shorter than the other. That there are two discharging calluses emanating from the seat of the fracture, and more than two years having elapsed at the time of the trial since the injury, he gave it as his opinion that plaintiff's condition was not likely to improve but little more in the future. He estimated plaintiff's capacity for labor at 50 or 60 per cent of what it formerly was.

It is our belief that unless an operation is performed and all the dead and infected bone removed, but little improvement may be looked for in plaintiff's physical condition and fitness for manual labor. He may improve some without an operation, but when and how much is a mere matter of conjecture. The operation, if performed, may leave him in the condition he is now. He walked and stooped at the request of

defendant at the time of trial, but declared that he had not done any kind of work since he was injured. He claimed that he had tried a good many times, such as hoeing on a farm, but that standing on his leg for so long as half an hour or an hour at a time pained him. He testified that he was unable to do even light work.

We are satisfied that plaintiff is not able to do any kind of work except manual labor. A man in the condition of plaintiff is not able, in our opinion, to do manual labor sufficient to earn his living. His injuries have therefore produced in him a permanent total disability to do work of any reasonable character within the meaning of the Employers' Liability Act. He is therefore entitled to the compensation which the law provides in such cases. The judgment appealed from is in our opinion erroneous and must be reversed and judgment rendered in favor of the plaintiff.

The judgment appealed from is therefore annulled avoided and reversed. And it is now ordered, adjudged and decreed that there be judgment in favor of plaintiff, Gonzalous Perkins and against the Long Bell Lumber Company, Inc., for 60 per cent of plaintiff's weekly wages of $14.40, said wages to commence May 23, 1924, and to continue for one hundred and seventy-five (175) weeks as fixed by subsection D of Sec. 8, Act 43 of 1922, which is the law governing the case; said wages being subject to a weekly credit of $8.64, commencing with the first week of liability and continuing each week thereafter until the sum of $658.64 has been credited. Said sums due as wages, less said credits, to bear 5 per cent per annum interest from the week each was due until same has been paid; defendant and appellee to pay the costs in both courts.